

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0306-14

**THE STATE OF TEXAS**

**v.**

**DAVID VILLARREAL, Appellee**

### ON STATE'S MOTION FOR REHEARING
### AFTER OPINION ON DISCRETIONARY REVIEW
### FROM THE THIRTEENTH COURT OF APPEALS
### NUECES COUNTY

**KEASLER, J., filed a dissenting opinion, in which HERVEY, J., joined.**

### DISSENTING OPINION

After exhibiting clear indications of intoxication during a routine traffic stop, David

Villarreal was escorted to a hospital, and his blood was drawn pursuant to a Texas statute

requiring such searches of drivers with two or more prior driving-while-intoxicated (DWI)

convictions. The judge suppressed the results of the blood draw as a Fourth Amendment

violation, and we affirmed.[1]  Properly weighing the circumstances of this particular case and the underlying interests at play, I dissent from this Court withdrawing its order granting the State's motion for rehearing.  Instead, I would withdraw our prior opinion and hold the search reasonable.

## I. Facts and Procedural History

On the night of March 31, 2012, Corpus Christi police stopped David Villarreal's vehicle.  The police suspected that Villarreal was intoxicated, and an officer from the department's DWI unit—trained and certified in field-sobriety tests—was called to the scene.  In the course of the traffic stop, Villarreal exhibited several signs of intoxication, including red and watery eyes, slurred speech, and swaying.  Villarreal refused the officer's request to undergo a standardized field-sobriety test.  Based on his own observations and those provided to him by the patrolman who initially stopped Villarreal, the officer then arrested Villarreal for DWI, handcuffed him, and read him his *Miranda* rights.  When the officer read the statutory warning requesting a blood sample, Villarreal refused.  But after searching Villarreal's criminal history, the officer learned that Villarreal had eight previous DWI arrests and three prior DWI convictions.  On the basis of those prior convictions, the officer escorted Villarreal to a nearby hospital where his blood was drawn by a qualified technician.

The officer obtained neither Villarreal's affirmative consent to the blood draw nor a

---

[1]  *State v. Villarreal*, No. PD-0306-14, 2014 WL 6734178 (Tex. Crim. App. Nov. 26, 2014).

court-ordered search warrant authorizing it. The officers ordered the blood draw pursuant to a provision of the Texas Transportation Code that mandates blood draws of drivers arrested for DWI with at least two prior DWI convictions.[2] The blood draw revealed a blood–alcohol concentration (BAC) level of 0.16, twice the statutory 0.08 level sufficient to qualify as "intoxicated."[3]

Based on his three prior DWI convictions, Villarreal was indicted for felony DWI.[4] Villarreal moved to suppress the results of the warrantless, non-consensual blood draw under the Fourth Amendment and the Supreme Court's recent decision in *Missouri v. McNeely*.[5] At the suppression hearing, the arresting officer conceded that there were no exigent circumstances and that he could have obtained a warrant for the blood draw, but argued that he did not have to because of the Texas Transportation Code's relevant provision. The judge granted Villarreal's motion, suppressed the blood-draw results, and denied the State's motion to reconsider. When the State filed an interlocutory appeal challenging the trial court's rulings, the court of appeals affirmed.[6]

## II. Analysis

---

[2] *See* TEX. TRANSP. CODE § 724.012(b)(3)(B).

[3] *See* TEX. PENAL CODE § 49.01(2)(B).

[4] *See id.* at §§ 49.04, 49.09(b).

[5] 133 S. Ct. 1552 (2013).

[6] *State v. Villarreal*, No. 13-13-00253-CR, 2014 Tex. App. LEXIS 645, at *34 (Tex. App.—Corpus Christi Jan. 23, 2014, pet. granted).

Statutes like the Transportation Code's mandatory blood-draw provisions "are presumed to be constitutional until it is determined otherwise."[7]  Nevertheless, the Supreme Court's recent holding in *Missouri v. McNeely* has sparked a renewed debate as to how the Fourth Amendment operates in DWI cases.  The Fourth Amendment secures the people "in their persons, houses, papers, and effects" from "unreasonable searches and seizures."[8]  The amendment itself can be broken into two clauses: (1) the Reasonableness Clause and (2) the Warrants Clause.[9]  Although a properly obtained warrant is often the surest way to prevent evidence from later being excluded at trial,[10] it is not the only constitutionally valid method of obtaining evidence.

While a search pursuant to warrant supported by probable cause and issued by a neutral magistrate will generally be presumed reasonable,[11] a warrantless search can also be reasonable if it falls within "a few specifically established and well-delineated exceptions."[12]  The State, however, bears the burden of establishing that the search falls under one of these exceptions.[13]  Although the Supreme Court has recognized several of these discrete

---

[7]  *See Karenev v. State*, 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).

[8]  U.S. CONST. amend. IV.

[9]  *See id.*

[10]  *See Terry v. Ohio*, 392 U.S. 1, 20–22 (1968).

[11]  *See United States v. Leon*, 468 U.S. 897, 922 (1984).

[12]  *United States v. Robinson*, 414 U.S. 218, 242 (1973).

[13]  *Id.* at 243.

exceptions to the general warrant requirement—including exigent circumstances—these exceptions are merely applications of the Fourth Amendment's general reasonableness standard.[14] Therefore, the "touchstone of the Fourth Amendment is reasonableness, not individualized suspicion."[15] And reasonableness is determined in relation to both the search's "scope and manner of execution."[16]

When evaluating the "traditional standards of reasonableness," we balance the degree to which the search "intrudes upon an individual's privacy" against the degree to which it "is needed for the promotion of legitimate governmental interests."[17] However, the relevant state interest is not a "fixed, minimum quantum of governmental concern."[18] Instead, it is an "interest that appears important enough to justify the particular search at hand, in light of other factors that show the search to be relatively intrusive upon a genuine expectation of privacy."[19]

---

[14] *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619 (1989) ("[T]he Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable.").

[15] *Samson v. California*, 547 U.S. 843, 855 n.4 (2006).

[16] *Maryland v. King*, 133 S. Ct. 1958, 1970 (2013) ("Urgent government interests are not a license for indiscriminate police behavior."). *See also Schmerber v. California*, 384 U.S. 757, 768 (1966) ("[T]he Fourth Amendment's proper function is to constrain, not against all intrusions as such, but against intrusions which are not justified in the circumstances, or which are made in an improper manner.").

[17] *Wyoming v. Houghton*, 526 U.S. 295, 299–300 (1999).

[18] *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995).

[19] *Id.*

**A.** **The Transportation Code does not create a per se exigency exception to the Fourth Amendment and the State has failed to establish exigency in this case.**

In *Missouri v. McNeely*, the Supreme Court held that the "natural metabolization of alcohol in the bloodstream" does not present a "per se exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases."[20] After a police officer observed a truck speeding and crossing the center line, he stopped the truck and noticed that its driver—McNeely—exhibited several signs of intoxication: bloodshot eyes, slurred speech, and the smell of alcohol on his breath.[21] McNeely admitted to the officer that he had been drinking and later performed poorly on a battery of field-sobriety tests.[22] When McNeely refused to allow the officer to measure his BAC level with a portable breath-test device, the officer drove McNeely to a nearby hospital so that his blood could be tested.[23] The test revealed a BAC level of 0.154, significantly above the legal limit of 0.08.[24] At no point did either McNeely affirmatively consent to the blood test or the officer obtain a warrant for the blood test.[25]

When McNeely moved to suppress the results of the blood test under the Fourth

---

[20] *McNeely*, 133 S. Ct. at 1556.

[21] *Id.*

[22] *Id.* at 1556–57.

[23] *Id.* at 1557.

[24] *Id.*

[25] *Id.*

Amendment, the prosecution argued that the "natural dissipation of alcohol in the bloodstream" created a per se exigency under the Fourth Amendment.[26] In effect, the prosecution wagered everything on dissipation alone. The Supreme Court rejected that per se approach to the exigency exception, opting instead for a "totality of the circumstances" approach, which the Court explained was the approach that it applied earlier in *Schmerber v. California*.[27] It noted that, in *Schmerber*, it had cited the dissipation of alcohol in the bloodstream only in conjunction with the "special facts" of the required hospitalization of the accused and investigation of the crime scene, which meant that "there was no time to seek out a magistrate and secure a warrant."[28] The Court further noted the advances that had occurred "in the 47 years since *Schmerber* was decided that allow for the more expeditious processing of warrant applications, particularly in contexts like drunk-driving investigations where the evidence offered to establish probable cause is simple."[29] But the Court warned that such advances did not foreclose all claims of exigency.[30]

Although the Supreme Court's holding in *McNeely* might appear at first glance to be

---

[26] *Id.* at 1558.

[27] *Id.* at 1559–60 ("Our decision in *Schmerber* applied this totality of the circumstances approach.").

[28] *Id.* at 1560 (citing *Schmerber*, 384 U.S. at 770–71).

[29] *Id.* at 1561–62 (noting technological advancements like warrant applications by telephone, radio, email, and video-conferencing).

[30] *Id.* at 1562 ("We by no means claim that telecommunications innovations have, will, or should eliminate all delay from the warrant-application process.").

a watershed decision in Fourth Amendment jurisprudence, its ultimate effect is narrow. The Supreme Court admits as much, stressing that the Court was reviewing only a proposed per se exigency exception to the Fourth Amendment based solely upon "the natural metabolization of alcohol in the bloodstream."[31] But before *McNeely*, we had already recognized that Fourth Amendment analysis generally disfavors per se rules and instead turns on "the particular facts and circumstances of the underlying case," with no one factor being determinative.[32] Therefore, any contention that the mandatory blood-draw provision pertaining to recidivist DWI offenders could be based solely on an exigency exception that itself is based solely on the dissipation of alcohol in the bloodstream has stood on shaky legal footing for some time—and clearly lacks any footing whatsoever post-*McNeely*. And because the arresting officer himself conceded during the suppression hearing that there were no exigent circumstances and that he could have obtained a warrant for the blood test, there is no reason that I would reject the judge's finding of a lack of exigency under the circumstances.[33]

---

[31] *Id.* at 1556. *See also id.* at 1569 (noting that "the instant case, by reason of the way in which it was presented and decided in the state courts, does not provide a framework where it is prudent to hold any more than that always dispensing with a warrant for a blood test when a driver is arrested for being under the influence of alcohol is inconsistent with the Fourth Amendment.") (Kennedy, J., concurring in part).

[32] *McGee v. State*, 105 S.W.3d 609, 616 (Tex. Crim. App. 2003).

[33] *See State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008) ("In reviewing a trial court's ruling on a motion to suppress, appellate courts must view all of the evidence in the light most favorable to the trial court's ruling.").

**B.     Given the circumstances of this case and the underlying interests at play, the blood draw was constitutionally reasonable.**

Nevertheless, my finding of a lack of exigency under the circumstances does not foreclose all possibility of finding the search of Villarreal constitutionally reasonable. Exigency is only one iteration of the general reasonableness framework of the Fourth Amendment. And considering all the relevant circumstances and interests at play in this case under that much broader framework—(1) Villarreal's status as a recidivist DWI offender, (2) the regulatory hallmarks of his offense, (3) the reasonable means and procedures of the search, and (4) the Legislature's enactment of the mandatory blood-draw provision itself—I conclude that the blood draw performed on Villarreal was reasonable.[34] While I believe that no one circumstance or interest alone can overcome Villarreal's subjective expectation of privacy, when considered together under the totality of the circumstances—as *McNeely* requires[35]—I conclude that they do. Although this analysis may not provide as much guidance to officers in the field as a bright-line rule would, as Justice Sotomayor stressed in *McNeely*, it is "hardly unique."[36]

---

[34] *See Illinois v. McArthur*, 531 U.S. 326, 330 (2001) ("When faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme Court] has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable.").

[35] *McNeely*, 133 S. Ct. at 1559–60.

[36] *Id.* at 1564 ("Numerous police actions are judged based on fact-intensive, totality of the circumstances analyses rather than according to categorical rules, including in situations that are more likely to require police officers to make difficult split-second judgments.").

Because I find no error in the officer's search of Villarreal, I do not address the State's alternative theories: (1) that Villarreal "is deemed to have consented" to the blood draw under the Transportation Code,[37] and (2) that the search resulted from a reasonable mistake of law. The State bases the latter argument on the Supreme Court's recent decision in *Heien v. North Carolina*,[38] an opinion issued after our initial holding in this case and which did not require exclusion of evidence so obtained. But the idea that even searches based on an erroneous understanding of the law do not require the exclusion of evidence if they result from a reasonable mistake of law only serves to demonstrate the degree to which reasonableness pervades Fourth Amendment analysis, and therefore bolsters my ultimate conclusion.[39]

### 1. Villarreal's status as a recidivist DWI offender results in a diminished expectation of privacy.

First and foremost, under the Fourth Amendment's general reasonableness standard, the Supreme Court has often recognized a lower expectation of privacy based on an individual's status. Prisoners are a ready example. In *Hudson v. Palmer*, the Supreme Court held that "society is not prepared to recognize as legitimate any subjective expectation of

---

[37] *See* TEX. TRANSP. CODE §§ 724.011, 724.013.

[38] 135 S. Ct. 530 (2014).

[39] *Id.* at 540 ("It was thus objectively reasonable for an officer in Sergeant Darisse's position to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop.").

privacy that a prisoner might have in his prison cell."[40]  While in prison serving multiple convictions, Palmer's locker and cell had been subjected to a "shakedown" search that revealed a ripped pillowcase.[41]  Prison officials brought a charge of destroying state property against Palmer, who was found guilty and ordered to reimburse the state.[42]  When Palmer challenged the prison's warrantless, non-consensual shakedown search under the Fourth Amendment, the Supreme Court held that it was "satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security."[43]

The Supreme Court later expanded this reasoning to probationers in *United States v. Knights*.[44]  Knights received probation for a drug offense that was conditioned on Knights submitting his "person, property, place of residence, vehicle, personal effects, to search at anytime, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer."[45]  When a police officer later suspected that Knights was involved in a vandalism and arson spree, he searched Knights's

---

[40]  468 U.S. 517, 525–26 (1984).

[41]  *Id.* at 519–20.

[42]  *Id.* at 520.

[43]  *Id.* at 527–28 ("We believe that it is accepted by our society that '[loss] of freedom of choice and privacy are inherent incidents of confinement.'") (citing *Wolfish*, 441 U.S. at 537).

[44]  534 U.S. 112 (2001).

[45]  *Id.* at 114.

apartment—based solely upon the probation condition—and found a cache of incriminating evidence linking Knights to the crime spree.[46] When Knights moved to suppress the fruits of that warrantless search, the Supreme Court noted the "dual concern" implicit in probation: "On the one hand is the hope that [the probationer] will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community."[47]

The Court particularly stressed the recidivism rate of probationers as part of its reasonableness analysis.[48] The Court held that when "an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable."[49] And in so doing, the Supreme Court rejected the interpretations of the district court and the Ninth Court of Appeals that held the search condition in the probation order "must be seen as limited to probation searches, and must stop short of investigation searches."[50]

---

[46] *Id.* at 115.

[47] *Id.* at 120–21.

[48] *Id.* at 120 ("The recidivism rate of probationers is significantly higher than the general crime rate.").

[49] *Id.* at 121.

[50] *Id.* at 116.

The Supreme Court continued this trend in 2006, when it extended this diminished expectation of privacy to parolees in *Samson v. California*.[51] In that case, the police detained Samson, a parolee, on suspicion that he was the subject of an outstanding parole warrant.[52] The police, however, quickly learned that no outstanding parole warrant existed.[53] The police nevertheless searched Samson "based solely on [his] status as a parolee."[54] Under California law, every state parolee was required to "agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause."[55] During the search the officers found a plastic baggie containing methamphetamine.[56]

The Supreme Court held the search constitutional because of Samson's diminished expectation of privacy as a parolee and the state's legitimate interest as his custodian.[57] The Court noted that in California, a parolee remains in the legal custody of the California Department of Corrections, must comply with all the terms and conditions of parole, and must sign an order submitting to suspicionless searches—all of which spurred the Court to

---

[51] 547 U.S. 843 (2006).

[52] *Id*. at 846.

[53] *Id*.

[54] *Id*. at 846–47.

[55] *Id*. at 846 (citing CAL. PENAL CODE ANN. § 3067(a) (West 2000)).

[56] *Id*. at 847.

[57] *Id*. at 850–57.

conclude that Samson "did not have an expectation of privacy that society would recognize as legitimate."[58] And the Court again stressed the state's interests in "reducing recidivism" and "promoting reintegration and positive citizenship."[59]

"No one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it."[60] And recidivism is a significant issue plaguing DWI offenders—just as the Supreme Court found it to be a significant issue plaguing probationers in *Knights*[61] and parolees in *Samson*.[62] According to the National Highway Traffic Safety Administration (NHTSA), "[h]istorically, drivers with prior DWI convictions have been overrepresented in fatal crashes, and the risk elevates for drivers with multiple DWI convictions."[63] Indeed, NHTSA recently calculated recidivism rates for DWI offenders at 25%, and calculated rates as high as 31% in 1995.[64]

Although the Supreme Court in *McNeely* held that "the general importance of the

---

[58] *Id.* at 851–52.

[59] *Id.* at 853.

[60] *McNeely*, 133 S. Ct. at 1565 (citing *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 451 (1990)).

[61] *See Knights*, 534 U.S. at 120.

[62] *See Samson*, 547 U.S. at 853.

[63] NAT'L HIGHWAY TRAFFIC SAFETY ADMIN., DOT HS 811 991, DWI RECIDIVISM IN THE UNITED STATES: AN EXAMINATION OF STATE-LEVEL DRIVER DATA AND THE EFFECT OF LOOK-BACK PERIODS ON RECIDIVISM PREVALENCE 1–2 (Mar. 2014), *available at* www.nhtsa.gov/staticfiles/nti/pdf/811991-DWI_Recidivism_in_USA-tsf-rn.pdf.

[64] *Id.* at 1.

government's interest in [policing drunk driving] does not justify departing from the warrant requirement without showing exigent circumstances that make securing a warrant impractical in a particular case," we are not now presented with the sort of plain-vanilla exigency case that the Supreme Court was in *McNeely*.[65] We are instead presented with a case involving a defendant who has at least three times already established a proclivity to endanger the public at large by driving intoxicated and who, on yet another occasion, exhibited clear indications of intoxication when pulled over and arrested. I do not believe that society is prepared to recognize an expectation of privacy equal to that of an ordinary citizen for an individual who has demonstrated such a clear and continual disregard for the safety of others on the roadways.

*Knights* also made clear that the State interest "in apprehending violators of the criminal law, thereby protecting potential victims of criminal enterprise, may therefore justifiably focus on probationers in a way that it does not on the ordinary citizen."[66] Although Villarreal is not a probationer, I find that his status as a recidivist DWI offender implicates the very same State interests as those pertaining to probationers: safeguarding the populace from recidivism. Indeed it would be unwise to hold, based on the simple fact that the Legislature has seen fit to protect that State interest by means of a mandatory blood-draw provision, that somehow the State interest is significantly less compelling than its interest in

---

[65] *See McNeely*, 133 U.S. at 1565.

[66] *Knights*, 534 U.S. at 121.

probation. The Legislature may have simply recognized that, as opposed to offenders who pose a more general threat of recidivist criminality that would require continual probationary supervision, recidivist DWI offenders pose a more specific threat—not that they are more likely to commit some crime, but that they are more likely to commit the specific crime of DWI—and fashioned its response accordingly.[67]

Furthermore, as in *Samson*, the Legislature has even placed Villarreal on notice that he would be subject to such a search based on his status as driver with two or more DWI convictions.[68] Although there is no evidence to show that he signed any notice agreement as Samson did, I do not find this distinction compelling because ignorance of the law is generally no excuse[69]—an assumption that is especially compelling when a person chooses to exercise not a right, but a privilege like driving.[70] And given that the police already had probable cause to arrest Villarreal for driving while intoxicated, any expectation of privacy

---

[67] *See Karenev*, 281 S.W.3d at 434 (presuming statutes constitutional).

[68] *See* TEX. TRANSP. CODE § 724.012(b)(3)(B). *See also Samson*, 547 U.S. at 846 (citing CAL. PENAL CODE ANN. § 3067(a) (West 2000)).

[69] *See, e.g.,* TEX. PENAL CODE § 8.03(a) ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). *See also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 581 (2010) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'").

[70] *See Tharp v. State*, 935 S.W.2d 157, 159 (Tex. Crim. App. 1996) ("Driving is not a constitutionally protected right, but a privilege.").

Villarreal might have "necessarily would be of a diminished scope."[71]  Therefore, I would hold that under the Fourth Amendment's general reasonableness standard, the government's heightened interest in protecting our roadways from an established DWI recidivist who had already been arrested after exhibiting clear indications of intoxication significantly diminished Villarreal's expectation of privacy.

## 2.    The search of Villarreal bears the hallmarks of a regulatory search.

Furthermore, although felony DWI is a criminal offense and the results of any blood draw performed pursuant to an arrest under it will likely be used in a subsequent criminal prosecution, it also exhibits many of the hallmarks of a regulatory offense, which generally afford a defendant a diminished expectation of privacy.  For example, beyond possible fines and jail time, DWI convictions can also lead to license suspension or revocation, annual surcharges to maintain a license, intervention and education programs, and the installation of ignition interlock devices.[72]  And as we have explained before, the "primary purpose" of such regulatory sanctions "is not to deter the licensee or to seek retribution, but is to protect the public from the carnage on the public roads of Texas caused by drunk drivers."[73]  These

---

[71] *Bell v. Wolfish*, 441 U.S. 520, 557 (1979). *See also King*, 133 S. Ct. at 1978 ("Once an individual has been arrested on probable cause for a dangerous offense that may require detention before trial, however, his or her expectations of privacy and freedom from police scrutiny are reduced.").

[72] *See generally* TEX. CODE CRIM. PROC. art. 42.12 § 13. *See also* TEX. TRANSP. CODE § 708.102.

[73] *See Tharp*, 935 S.W.2d at 159 (addressing the administrative license-suspension provision of the former TEX. REV. CIV. STAT. art. 6687b-1).

regulatory consequences of a felony-DWI offense further highlight the State's legitimate interest in protecting its roadways from DWI recidivism.

In *Skinner v. Railway Labor Executives' Association*,[74] several associations of railway workers sought to enjoin the Federal Railroad Administration under the Fourth Amendment from promulgating regulations mandating similar blood and urine tests of railway workers involved in train accidents. The Supreme Court initially recognized that a blood draw "infringes an expectation of privacy that society is prepared to recognize as reasonable."[75] But in rejecting this facial challenge to the regulation, the Court noted the governmental interest "in ensuring the safety of the traveling public and of the employees themselves," which "plainly justifies prohibiting covered employees from using alcohol or drugs on duty, or while subject to being called for duty."[76] And the Court held that this interest "requires and justifies the exercise of supervision to assure that the restrictions are in fact observed."[77]

Given the number of innocent people who travel our roadways and the numerous DWI-related tragedies that occur each year, the State possesses just as compelling—possibly even more compelling—an interest in ensuring the "safety of the traveling public" on our roadways as on our railways. Therefore, that interest "requires and justifies" the same sort

---

[74] 489 U.S. 602 (1989).

[75] *Id.* at 616.

[76] *Id.* at 621.

[77] *Id.* (citations omitted).

of "supervision to assure that the restrictions are in fact observed" as the Supreme Court allowed in *Skinner*.[78] And I do not believe that a simple blood draw performed on a driver with an extensive DWI history who has already been properly arrested on suspicion of DWI and would therefore be subject to a whole battery of searches—fingerprinting, booking, inventory, and possibly even buccal-swab searches—is any more unreasonable under the circumstances than one performed on a railway worker who just happens to be working when an accident occurs.

### 3. The means and procedures of the search performed on Villarreal were reasonable.

It is also significant to a general reasonableness analysis that the blood draw performed on Villarreal was reasonable in both its means and procedures. The Supreme Court has acknowledged that blood draws—as invasions of a person's bodily integrity—implicate a person's "most personal and deep-rooted expectations of privacy."[79] But it has also recognized that the Fourth Amendment "neither forbids nor permits all such intrusions," but instead constrains against "intrusions which are not justified in the circumstances, or which are made in an improper manner."[80] We have held that this requires

---

[78] *See id.*

[79] *Winston v. Lee*, 470 U.S. 753, 760 (1985).

[80] *Id.* (citing *Schmerber*, 384 U.S. at 768).

that both the "means" and "procedures" employed be constitutionally reasonable.[81]

In order for the means employed to be reasonable, we must determine whether "the test chosen was reasonable."[82] The Supreme Court has long recognized that the search employed on Villarreal—a blood test—is a "highly effective means of determining the degree to which a person is under the influence of alcohol."[83] And this effectiveness stands in marked contrast to the two most common substitutes for a blood test: (1) a less accurate reading from a breath test, and (2) an officer's subjective analysis of a driver's performance in a battery of field-sobriety tests. Thus, a properly performed blood test serves our judicial system's interest in ensuring, to the best degree possible, access to the most accurate and objective evidence of a driver's sobriety.

Similarly, in order for the procedures of a search to be reasonable, we must determine whether "the test was performed in a reasonable manner."[84] Although a blood draw does implicate Fourth Amendment principles, the one Villarreal underwent—executed in a hospital by a qualified technician—can hardly be deemed unreasonably performed under the

---

[81] *State v. Johnston*, 336 S.W.3d 649, 658 (Tex. Crim. App. 2011) (citing *Schmerber*, 384 U.S. at 768, 771).

[82] *Id.*

[83] *See Schmerber*, 384 U.S. at 771 ("[W]e are satisfied that the test chosen to measure petitioner's blood-alcohol level was a reasonable one.").

[84] *Id. See also Johnston*, 336 S.W.3d at 658.

circumstances. In contrast, we held in *McGee v. State*[85] that a warrantless cavity search performed by a police officer in a fire station was reasonable under the circumstances. The police received a tip that McGee and two other men had been selling crack cocaine at an intersection and that McGee had been hiding the drugs between his buttocks.[86] When police arrived at the intersection, they found three men matching the descriptions given, smelled marijuana, and saw blue smoke indicative of marijuana use.[87] When McGee admitted that someone else had been smoking marijuana, police handcuffed the three men and drove them to a nearby fire station.[88] At the station, a police officer found several rocks of crack cocaine on McGee when he escorted McGee to a private area of the station and ordered him to "drop his pants, bend over, and spread his buttocks."[89]

When McGee challenged the constitutionality of this warrantless, non-consensual search, we upheld it despite such "[v]isual body-cavity searches" being "among the most intrusive of searches."[90] We determined that the "legitimate interests of law enforcement outweigh[ed] the intrusiveness of the search."[91] In doing so, we noted that the search, while

---

[85] 105 S.W.3d 609 (2003).

[86] *Id*. at 612.

[87] *Id*.

[88] *Id*. at 612–13.

[89] *Id*. at 613.

[90] *Id*. at 616.

[91] *Id*.

uncomfortable, was not violent, was performed by an officer with on-the-job experience in performing cavity searches, and was carried out in a hygienic environment with sanitary rubber gloves.[92]

In contrast to McGee's ordeal, the search performed on Villarreal strikes me as far more reasonable. Although both were initially arrested based on probable cause, only Villarreal was searched within the sterile confines of a hospital.[93] And only the search of Villarreal was performed by a trained medical professional.[94] The Supreme Court stressed the importance of these two distinctions in *Schmerber*.[95]

But most importantly, the nature of the two searches differed greatly. Since *Schmerber*, the Supreme Court has considered blood draws "commonplace," and has noted

---

[92] *Id.* at 616–17.

[93] *See id.* at 617 ("The search occurred in a fire station. . . . The fire station was not as sterile an environment as a hospital."). *See also Johnston*, 336 S.W.3d at 662 ("Though a medical environment may be ideal, it does not mean that other settings are unreasonable under the Fourth Amendment. According to our research, reasonableness depends upon whether the environment is a safe place in which to draw blood.").

[94] *See McGee*, 105 S.W.3d at 616 ("Officer Rowan testified that while he had never had formal training for conducting cavity searches, he had on-the-job experience while working with senior officers.").

[95] *See Schmerber*, 384 U.S. at 771–72 ("We are thus not presented with the serious questions which would arise if a search involving use of a medical technique, even of the most rudimentary sort, were made by other than medical personnel or in other than a medical environment—for example, if it were administered by police in the privacy of the stationhouse. To tolerate searches under these conditions might be to invite an unjustified element of personal risk of infection and pain.").

that "for most people the procedure involves virtually no risk, trauma, or pain."[96]  And

*McNeely* did not overrule *Schmerber*.[97]  Its sole critique of *Schmerber*—noting "the 47 years

since *Schmerber* was decided"—only questioned the exigent circumstances that drunk-

driving investigations can create, not the commonplace nature of a blood draw itself.[98]  In

contrast, the Supreme Court has warned that a body-cavity search, like the one performed on

McGee, "instinctively gives [the Court] the most pause."[99]  We ourselves have found that

such searches can be "demeaning, dehumanizing, undignified, humiliating, and terrifying."[100]

Thus, if the visual body-cavity search performed on McGee passed the rigors of the Fourth

Amendment's reasonableness standard, how can we now find that the commonplace blood

draw performed on Villarreal does not?

### 4. The Legislature's enactment of the Transportation Code's mandatory blood-draw provision is worthy of consideration.

Finally, I believe the Legislature's decision on this issue is worthy of consideration.

The United States Constitution is the "supreme Law of the Land."[101]  No state can legislate

around its strictures, including the Fourth Amendment.  And it is a bedrock constitutional

---

[96] *Id.* at 771.

[97] *McNeely*, 133 S. Ct. at 1560 ("Thus, our analysis in *Schmerber* fits comfortably within our case law applying the exigent circumstances exception.").

[98] *Id.* at 1561–62.

[99] *Wolfish*, 441 U.S. at 558.

[100] *McGee*, 105 S.W.3d at 616 (citations omitted).

[101] U.S. CONST. art. VI, cl. 2.

principle that it is "emphatically the province and duty of the judicial department to say what the law is."[102] Nevertheless, the Supreme Court has acknowledged—for example, in circumstances relating to fingerprinting—some role for state legislatures in assisting to shape the contours of the Fourth Amendment's protections.[103]

Therefore, judges should not interpret their authority as a monopoly on constitutionality. It is not a license to act like bullies in black robes. Instead, legislatures should be allowed some role in shaping and framing constitutional issues, especially those like the Fourth Amendment that delve into vague and esoteric concepts like "reasonableness" and "expectation[s] of privacy that society would recognize as legitimate."[104] Compared to the judicial branch, the Legislature is well-equipped structurally, as the representative of Texans generally, to clarify these difficult concepts. And this concept is not new to our jurisprudence. It is why we generally presume a statute constitutional "until it is determined otherwise."[105]

However, judges must never forget that the Fourth Amendment was established as a check on government action, including action by the Legislature. Therefore, I would not

---

[102] *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.").

[103] *Hayes v. Florida*, 470 U.S. 811, 817 (1985) (referencing *Davis v. Mississippi*, 394 U.S. 721, 728 (1969) and *Dunaway v. New York*, 442 U.S. 200, 215 (1979)).

[104] *See Samson*, 547 U.S. at 852, 855 n.4.

[105] *See Karenev*, 281 S.W.3d at 434.

interpret the Transportation Code's provisions as per se rules allowing warrantless, non-consensual blood draws. The State cannot merely invoke a statutory provision to escape Fourth Amendment analyses. Such an interpretation would comport with neither state nor federal law.[106] But that did not occur here. Although the arresting officer did focus his authority to compel a blood draw of Villarreal on the relevant Transportation Code provision and conceded that there were no exigent circumstances, he also testified that Villarreal exhibited clear signs of intoxication, had been properly arrested on suspicion of DWI, and possessed a DWI history well beyond the requirements of the provision.

Therefore, I interpret the Transportation Code's provisions as significant—but not necessarily determinative—evidence of the nature and weight of the state interests at play in policing intoxicated driving. They are but one consideration in the Fourth Amendment's overall "totality of the circumstances" analysis that we have long recognized and that the Supreme Court reaffirmed in *McNeely*. And I find the provision pertaining to recidivist DWI offenders a particularly compelling circumstance in that analysis, especially when considered in conjunction with Villarreal's clear indications of intoxication that led to his arrest and his extensive DWI history beyond the provision's requirements.

### III. Conclusion

In light of all the circumstances particular to this case and the underlying interests at play, I would hold that the blood draw performed on Villarreal was reasonable. Therefore

---

[106] *McNeely*, 133 S. Ct. at 1559–60; *McGee*, 105 S.W.3d at 616.

I would withdraw our prior opinion and conclude that the trial court erred in suppressing the results of the blood draw. For these reasons, I respectfully dissent.

DELIVERED: December 16, 2015

PUBLISH